UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SCOTT ROSENBERG,<br><br>           Plaintiff,<br><br>           v.<br><br>LINCOLN FINANCIAL GROUP, et al.,<br><br>           Defendants,<br><br>INTERNATIONAL BUSINESS MACHINES CORP.,<br><br>           Third-Party Defendant. | Civil Action No.<br>09-1785-NLH-JS<br><br>**OPINION** |

**APPEARANCES**:

Scott Rosenberg
157 Steelmanville Road
Egg Harbor Township, NJ 08234
*Plaintiff, Pro Se*

Mark A. Saloman, Esquire
Ira M. Golub, Esquire
Proskauer Rose, LLP
One Newark Center
Newark, NJ 07102
*Attorneys for Defendant Ceridian Benefits Services, Inc.*

Jeffrey P. Resnick, Esquire
Sherman, Silverstein, Kohl, Rose & Podolsky, PC
4300 Haddonfield Road, Suite 311
Pennsauken, NJ 08109
*Attorneys for Defendant Lincoln National Corp.*

Christine S. Orlando, Esquire
Edward S. Wardell, Esquire
Wardell, Craig, Annin & Baxter, LLP
41 Grove Street
Haddonfield, NJ 08033
*Attorneys for Defendant Aetna Life Insurance Company*

**HILLMAN, District Judge**

## I. INTRODUCTION

This matter comes before the Court on the motion of Plaintiff, Scott Rosenberg, for partial summary judgment [36], the cross-motion of Defendant Aetna Life Insurance Company ("Aetna") for summary judgment [44], the motion of Defendant Ceridian Benefits Services, Inc. ("Ceridian") for summary judgment [61], and the motion of Defendant Lincoln National Corp. ("Lincoln") for summary judgment [62].  For the reasons set forth below, Plaintiff's motion will be denied, and Defendants' motions will be granted.

## II. BACKGROUND

Plaintiff, a registered financial services representative with licenses to sell life, health, and variable life insurance, was employed by Lincoln.  On August 15, 2007, Lincoln terminated Plaintiff's employment.  Thereafter, on September 6, 2007, Plaintiff received notice from Ceridian, Lincoln's third-party COBRA administrator through December, 2007, of his right to elect continued health insurance through COBRA.

Based upon his training as a licensed insurance salesman and prior experience obtaining COBRA coverage administered by Ceridian after a prior job, Plaintiff was aware of the requirements of COBRA.  Further, shortly after receiving the notice of his right to elect coverage, Plaintiff received a form

2

from Ceridian entitled "Frequently Asked Questions Regarding Your Health Coverage," which he read and understood.  This form made clear that should Plaintiff elect continued coverage his premium payments would be due on the 16th of every month, after which he would be given a 30-day grace period.  It also made clear that delaying payment until the end of the grace period could result in the temporary suspension of coverage, due to an insufficient amount of time to correct any errors or delays in processing the payment.  Although, as the notice made clear, coverage would be retroactively reinstated once payment was received and processed.  Plaintiff also understood that any failure to comply with payment obligations would result in the termination of his COBRA rights.

   On November 1, 2007, Plaintiff elected to continue his group health coverage through COBRA.  Thereafter, on November 13, 2007, Plaintiff received a "Welcome to Ceridian" letter, which contained a page entitled "Important Information Regarding COBRA Coverage and Payments," as well as his first "COBRA Continuation Coverage Invoice" from Ceridian.  The invoice set the due dates for Plaintiff's premium payments as August 16, September 16, October 16, and November 16, with a grace period deadline for all four initial payments of December 17, 2007.  Plaintiff understood that his coverage would be cancelled if his premium payments were not made by December 17, 2007 at the latest.

On Friday, December 14, 2007, Plaintiff wrote a check from his account at Commerce Bank to Ceridian in the amount of $1,380.20, the full amount of the four premiums due to continue his benefits through December 17, 2007.  However, Plaintiff waited to mail this check until Monday, December 17, 2007 at 12:59 p.m., 11 hours before the expiration of his grace period.

Upon receipt by Ceridian, premium payments are routed from its mailroom to its Check Processing Department, where the payment is processed by an automated system that verifies that the payment was received before the grace period deadline.  This process generally takes between one and three days, from the time the payment is received to the time it is credited to the account.  Where the check is received after the grace period expires, as was the case here, it is rejected by the automated system and sent for a manual review to determine whether the payment was postmarked on or before the deadline.  This manual review can take anywhere from several days to more than one week, from the time the payment is received to the time it is credited to the account, or returned if determined to be untimely.

Plaintiff's premium payment arrived at Ceridian's facility on Thursday, December 20, 2007, three days after his grace period deadline.  The payment was thus rejected by Ceridian's automated system and sent for manual review to verify whether it had been postmarked by the deadline.  On Monday, December 24, 2007,

4

Plaintiff called Ceridian's Human Resources Outsourcing business unit to check on the status of his account and was told that his account did not yet reflect that his check had been received for processing.  Later that day, Ceridian sent Plaintiff a computer-generated form letter because one week had elapsed since the expiration of his grace period and his payment had not been processed yet.  This letter provided: "This is to advise you that you are no longer eligible for COBRA Continuation due to: Failure to comply with premium payment requirement."

On Friday, December 28, 2007, Ceridian's manual review confirmed that Plaintiff's premium payment had been postmarked on December 17, 2007.  As a result, Plaintiff's premium payment was processed and applied to his account.  His coverage, therefore, remained in force as of that date.  The following day, on Saturday, December 29, 2007, Plaintiff received the form letter from Ceridian advising him that he was no longer eligible for coverage.  Plaintiff was unable to contact Ceridian about the letter right away, as Ceridian's hours of operation were 8:00 a.m. to 8:00 p.m. EST, Monday through Friday.  Upon receipt of the letter, on December 29, 2007, Plaintiff accessed his account at Commerce Bank on-line and placed a stop payment on his check to Ceridian.  He was aware at that time that his check had not yet been cashed by Ceridian.

5

On Monday, December 31, 2007, Plaintiff called Ceridian "[t]o see if there was an honest mistake that Ceridian was willing to correct." During that call, which was recorded by Ceridian in its entirety, Plaintiff had the following exchange with Tamika Flowers, a representative of Ceridian:

> Mr. Rosenberg: I received a letter in the mail on Saturday saying eligibility was no longer available due to failure to comply with payment requirements.
>
> Ms. Flowers: . . . And what was the date on that letter again?
>
> Mr. Rosenberg: December 24th.
>
> Ms. Flowers: . . . That's because it looks like we received your payment after the post mark date, but with a good post mark. So the payment will be applied to the account.
>
> Mr. Rosenberg: You received it on the 19th, why is this letter made out on the 24th?
>
> Ms. Flowers: . . . actually, we received it on the 20th. Your grace date was the 17th. It was post marked on the 17th, so they did enter it in the system.
>
> Mr. Rosenberg: And when was it entered into the system?
>
> Ms. Flowers: . . . it wasn't entered until the 28th for some reason. It doesn't say exactly why.
>
> Mr. Rosenberg: . . . And when will I be receiving a letter rescinding this letter?
>
> Ms. Flowers: They won't re-send a letter, they'll just continue to bill you. You have until January 15th to make you next payment.
>
> Mr. Rosenberg: So I'm not getting a letter

>     that rescinds this letter?
>
>     Ms. Flowers: I mean, your account is still active.
>
>     Mr. Rosenberg: Okay.  I'll have to respond to that letter.  Okay.  Thanks for your help.
>
>     Ms. Flowers: All right.  Thank you for calling Ceridian Benefit Services.

During this call, Plaintiff did not notify Ceridian that he had stopped payment on his check.  Later that day, Plaintiff sent Ceridian a letter demanding written confirmation that his account was still active.  On January 2, 2008, Ceridian allegedly sent Plaintiff a letter confirming that his COBRA benefits were still in effect, although Plaintiff denied receiving any such letter.

Plaintiff never had his bank lift the stop payment or sent Ceridian a new check for his premium payments.  On January 4, 2008, Ceridian was notified by its bank that Plaintiff's check had been returned because of a stopped payment.  Thereafter, on January 7, 2008, Ceridian sent Plaintiff a letter advising him that his check had been returned due to a stopped payment, that his premiums remained unpaid, and that his COBRA eligibility had expired without avenue for reinstatement.

Beginning on January 1, 2008, Aetna took over from Ceridian as Lincoln's third-party COBRA administrator.  Prior to Aetna's take over from Ceridian, on October 30, 2007, Lincoln notified its COBRA participants of the coming change in third-party COBRA administrators.  This notification made clear that premiums for

continued COBRA coverage in January 2008 were due to Aetna by January 1, 2008. Plaintiff denies having received this notice. Nonetheless, COBRA participants were again notified by Lincoln of the coming change in third-party COBRA administrators on November 5, 2007.

On November 30, 2007, Aetna received a list of qualified beneficiaries for COBRA enrollment from Lincoln, which included Plaintiff. Aetna processed Plaintiff's enrollment on December 3, 2007, with an effective date of January 1, 2008, to ensure a smooth transition from administration through Ceridian to Aetna. In December 2007, Aetna issued an invoice to Plaintiff for January 2008 premiums. Thereafter, on December 18, 2007, Plaintiff contacted Aetna's call center to advise it that he had been on a 16-day billing cycle with Ceridian. Plaintiff was advised that Aetna did not offer a 16-day billing cycle and that his premium payment for the month of January had to be received by January 31, 2008. Plaintiff was also advised to make his payments to Ceridian through December 31, 2007, as Aetna would not begin administrating his benefits until January 1st. On January 8, 2008, Aetna sent Plaintiff an invoice for his February 2008 premiums. Plaintiff never made any payments to Aetna.

At some point following his receipt of Ceridian's January 7, 2008 letter, Plaintiff reached out to Lincoln, and was assisted by one of its employees, Patti Storer. On January 29, 2008,

Storer sent Plaintiff an email confirming their phone conversation and advised him that if he sent the outstanding premium payments for 2007 to her and the outstanding premium payments for 2008 to Aetna by February 4, 2008, his COBRA benefits would be reinstated.  This email also advised Plaintiff that failure to sent the outstanding premium payments by February 4th would result in the rescinding of his coverage.

Subsequently, on February 14, 2008, Plaintiff emailed Storer that "[p]ayment of my obligation under COBRA was tendered for a second time to your attention on the Wednesday after you were finally able to determine from your outside contractors what was in fact owed for the COBRA premium," and that "[i]f you have not received it yet, then I would suggest Lincoln provide me with a Fed Ex account number so I can send you yet another check on Monday when I return home."  Plaintiff now concedes, however, that no checks were ever sent to either Lincoln or Aetna.

On February 4, 2008, Aetna issued a notice to Plaintiff terminating his continuation coverage for non-payment of premiums.  On February 26, 2008, an Aetna employee, Celeste Zdandis, placed a notation in the Atenta system requesting to be notified if premium payments from Plaintiff were ever received so that she could coordinate with Lincoln to reinstate Plaintiff's COBRA coverage.  No such payments were ever received.  On March 13, 2008, Aetna received an email from Lincoln advising that

9

Plaintiff was not eligible for COBRA.

Plaintiff filed his Complaint in this matter on April 20, 2009, alleging violations of COBRA. Thereafter, on August 14, 2009, Plaintiff filed a Motion for Partial Summary Judgment. In response, Defendant Aetna filed a Cross-Motion for Summary Judgment on September 8, 2009. Defendants Ceridian and Lincoln subsequently both filed motions for summary judgment on December 15, 2009. These motions are presently before the Court.

### III. DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility

determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.   Analysis**

COBRA provides former employees with the right to limited continuation coverage under their former employer's group health insurance plans at their own expense following the occurrence of certain qualifying events, such as an employees termination. See 29 U.S.C. § 1161(a). Pursuant to the provisions of COBRA, health plans may require the timely payment of premiums for the

11

continuation of coverage.  <u>See</u> 29 U.S.C. § 1162(3).  Failure to pay premiums may result in the termination of coverage.  <u>See</u> 29 U.S.C. § 1163(2)(C); <u>see also</u> <u>Geissal v. Moore Medical Corp.</u>, 524 U.S. 74, 80 (1998) ("Benefits may cease if the qualified beneficiary fails to pay the premiums."); Treas. Reg. §§ 54.4980-B, Q&A-1(a)(2), 54.4980B-8, Q&A-1(a) (providing that failure to make premium payment by last day of applicable grace period may result in coverage being terminated retroactively to the first day of the period for which timely payment was not made).

In this case, there is no dispute that neither Ceridian or Aetna, acting as third-party administrators for Lincoln, ever received a premium payment from Plaintiff for his COBRA benefits.  Although Plaintiff initially sent a check to Ceridian for the amount of his premiums, there is no dispute that he subsequently placed a stop order on that check so that Ceridian was never able to cash it.  Similarly, there is no dispute that Plaintiff failed to tender any payment to Ceridian, Aetna, or Lincoln for his COBRA premiums at any time following his placement of the stop order.  Accordingly, Defendants were free to terminate Plaintiff's continuation coverage under COBRA.

It appears from the record that Plaintiff's placement of a stop order on the check he sent to Ceridian was prompted by the December 24, 2007 letter from Ceridian, advising Plaintiff that his coverage had been terminated for lack of payment.  While

Plaintiff's actions in response to this confusing letter may have been justified, his subsequent failure to make any premium payments upon be advised that his coverage would be restored is not.  As late as January 29, 2008, Plaintiff was advised that his coverage would be restored if he simply submitted his 2007 premiums to Lincoln and his 2008 premiums to Aetna by February 4, 2008.  At no time, however, did Plaintiff submit these payments.

Plaintiff's central argument seems to be that the December 24, 2007 letter from Ceridian in and of itself violated COBRA.  Had the story ended there -- with Plaintiff having mailed a timely check to Ceridian and his coverage being terminated -- this argument would likely have merit.  However, the story did not end there.  Plaintiff subsequently learned that his coverage had not in fact been terminated, and was even given an opportunity to resubmit his payment and have his coverage reinstated after the confusion surrounding his prior stop payment order became clear.  In the face of these undisputed facts, Plaintiff has failed to cite any authority to suggest that the confusion created by Ceridian's December 24, 2007 letter entitled him to continued coverage without having to pay any premiums.[1]

---

[1] Plaintiff argues that he was willing to resend his premium payment upon receipt of written confirmation that his coverage was reinstated.  However, Plaintiff fails to cite any authority to suggest that he was entitled to a written guarantee of coverage before having to pay his premiums.

13

Plaintiff also seems to argue that Aetna violated COBRA by double-billing him for the period of January 1, 2008 through January 15, 2008. However, there is no evidence in the record to suggest this was the case. The record demonstrates, and Plaintiff does not dispute, that Lincoln changed its third-party administrator for COBRA benefits effective January 1, 2008. As a result of this change, Ceridian's final invoice, which was based on a payment cycle set out before the change in third-party administrators was established, was for December 16, 2007 through January 15, 2008, while Aetna's first invoice was for January 1, 2008 through January 31, 2008. Although this created a window for which Plaintiff had invoices from both Ceridian and Aetna, Lincoln specifically advised Plaintiff how to proceed in its January 29, 2008 email. Lincoln advised Plaintiff that he could make his 2007 premium payments directly to it, thereby pro-rating the final Ceridian invoice to avoid any double-billing, and then make his January payment to Aetna as invoiced. The Court thus finds this argument unpersuasive. Moreover, even if there were some merit to this argument, Plaintiff never made any payments whatsoever for January, 2008.

Finally, Plaintiff argues that Defendants failed to provide "statutory notice." However, Plaintiff fails to identify what notice he was entitled to and did not receive. Plaintiff does not dispute that he was given notice of his right to elect

continuation coverage on September 6, 2007, notice of his rights and responsibilities under COBRA shortly thereafter, and notice of his premium payments on November 13, 2007.  Nor does Plaintiff dispute that he was specifically advised by Lincoln on January 29, 2008 of the steps he could take to have his coverage reinstated.  In the absence of any specific evidence as to what further notice he was entitled to and denied this claim must fail.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment shall be denied, and Defendants' motions for summary judgment shall be granted.  An Order consistent with this Opinion will be entered.


Dated:  April 12, 2010         s/ Noel L. Hillman
                               HON. NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey